**SUSAN MARTIN (AZ#014226)**
**JENNIFER KROLL #019859)**
**MARTIN & BONNETT, PLLC**
1850 N. Central Ave. Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
jkroll@martinbonnett.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice* app. to be filed)
Lesley F. Portnoy (*pro hac vice* app. to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (*pro hac vice* app. to be filed)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| NADER SALEH, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| APOLLO EDUCATION GROUP, INC., GREGORY W. CAPPELLI and BRIAN L. SWARTZ, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff Nader Saleh ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Apollo Education Group, Inc. ("Apollo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Apollo securities between October 19, 2011 and April 1, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 promulgated thereunder against the Company and certain of its top officials and/or directors.

2.     Apollo is a publicly traded, for-profit education company headquartered in Phoenix, Arizona. Apollo employs approximately 15,000 non-faculty employees, and approximately 29,000 faculty members, and enrolls over 250,000 students across its online and in person course offerings. The Company, through its subsidiaries, offers associate, bachelor, masters and doctorate degrees to students around the world in over 100 fields. The Company's

largest reporting segment, The University of Phoenix, generates more than $4 billion in revenue.

3.      Apollo's founder, John Sperling, is often credited as being the pioneer of the for-profit education industry. Apollo and other companies in this industry tout themselves as providing valuable educational opportunities to those who may be unable to attend traditional colleges and universities – such as working adults, and those seeking to take on-line courses – and as filling the education gap left by non-profit private and public institutions of higher learning. Particularly, as many Americans have fallen on difficult economic times in recent years, business has been booming for these for-profit institutions as students have sought out new educational opportunities in hopes of improving their earning potential and embarking on new career paths. In 2008, nearly two million students were enrolled in for-profit institutions. Not only have these companies attracted substantial numbers of students, they have been able to raise significant capital from investors by publicly portraying their business models as successful, growing, and sustainable.

4.      The Company derives over 80% of its revenues from federal education funds, such as the Pell grant and Stafford loan programs, which assist students in paying for higher education programs.

5.       Because many students drop out of Apollo's student programs, enrollment growth is critical to the success of the Company. In order to meet revenue and profit expectations, Apollo recruits as many students as possible to enroll in its programs.

6.     In or around 2009, the Company established repayment management initiatives, as the financial crisis was peaking, and as private lenders ceased making loans to Apollo students.

7.     The repayment management initiatives helps keep Apollo from running afoul of the so-called "90/10 Rule," a government regulation enacted in October 1999, that requires for profit colleges such as Apollo, to ensure that at least 10% of their revenues comes from non-state financial aid sources, such as Pell Grants or Stafford loans.

8.     Furthermore, under federal regulations, if an institution's three-year cohort default rate equals or exceeds 30% for any given year, it must establish a default prevention task force and develop a default prevention plan with measurable objectives for improving the default rate. The Company explicitly confirmed to investors that it was in compliance with these federal regulations, stating: "[w]e believe that our current repayment management efforts meet these requirements. Beginning with the three-year cohort default rate for the 2011 cohort published in September 2014, only the three-year rates will be applied for purposes of measuring compliance."

9.     On August 3, 2010, the United States Government Accountability Office ("GAO") issued a report concluding that for-profit educational colleges such as Apollo had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of their education. Thereafter, a Congressional Committee launched an investigation of such practices; the U.S. Department of Education released data showing that the loan repayment rates for Apollo enrollees were well below the

4

level required for federal loan program eligibility; and the Company disclosed that its enrollee default rates had significantly increased.

10.     Over the course of the following two years, and in response to the GAO report and Congressional investigation, several state authorities began investigating the Company, including the Attorney General's Office for the states of Florida, Massachusetts, and Delaware.

11.     In response to reports of similar misconduct by other for-profit education companies, in June 2011, President Obama released final regulations requiring for profit colleges such as Apollo to better prepare students for gainful employment or risk losing access to Federal student aid. Under the new gainful employment regulations:

> [A] program would be considered to lead to gainful employment if it meets at least one of the following three metrics: at least 35 percent of former students are repaying their loans (defined as reducing the loan balance by at least $1); the estimated annual loan payment of a typical graduate does not exceed 30 percent of his or her discretionary income; or the estimated annual loan payment of a typical graduate does not exceed 12 percent of his or her total earnings.

12.     Throughout the Class Period, the Company continually touted its compliance with these new regulations.

13.     Despite these representations, the compliance efforts of the Company, including the default management program, served only to perpetuate the inherent issues with the Company's high student default rates and low graduation and gainful employment statistics. The Company's compliance measures were in fact nothing more than a small bandage over a deep and festering wound, which jeopardized the Company's core operational health.

14.     On July 30, 2012, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee, completed a two-year investigation of the for-profit college industry, and issued a report (the, "Harkin Report") filled with troubling statistics and findings regarding the for profit college industry, and specifically about Apollo.

15.     After the Harkin Report was published, the Company's shares fell 4.1% or $1.17, to close at $27.22 on July 30, 2012.

16.     According to the Harkin Report, the Company's aggressive lending and recruiting practices resulted in a student body that is underprepared for college, generally unable to obtain gainful employment, and laden with a significant amount of debt. Indeed, the Company's student population has one of the highest default rates in the country, according to a study cited by a United States Senate committee report, and is at risk of losing its eligibility for Federal financial aid as a result of its extremely high default rate. The report stated:

> The 3 year default rate across all 30 companies examined increased each fiscal year between 2005 and 2008, from 17.1 percent to 22.6 percent. This change represents a 32.6 percent increase over 4 years. Apollo's default rate has similarly increased, growing from 12 percent for students entering repayment in 2005 to 20.9 percent for students entering repayment in 2008. The company expects the rate for 2009 to be 26.7 percent. Company officials have also told investors that they do not expect the 2010 rate to exceed 30 percent. This is important because, as of 2014, a 3-year default rate of greater than 30 percent will result in a loss of access to title IV funding.
>
> ***
>
> An internal email from an associate vice president at Apollo makes clear that the long-term prognosis for students is even worse. The email documents that the company expects the lifetime default rates for Associate degree students entering repayment in 2006 to be 77.7 percent and to be 55.8 percent for students entering repayment in 2007.

17.     Furthermore, according to the Harkin Report, in response to the rising default rate of its student borrowers, the Company began a series of "default management" programs in an attempt to prevent revocation of Apollo's Federal financial aid eligibility. The default management program, however, did not actually solve the issue of loan defaults, but instead placed student loans on deferment and forbearance, to allow the Company to account for these loans as performing and not in default, thus maintaining the appearance of compliance with federal regulations. The report stated:

> It is likely that the reported default rates significantly undercount the number of students who ultimately face default, because of companies' efforts to place students in deferments and forbearances. Helping get delinquent students into repayment, deferment, or forbearance prior to default is encouraged by the Department of Education. However, for many students forbearance and deferment serve only to delay default beyond the 3-year measurement period the Department of Education uses to track defaults.

> Default management is sometimes accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. While the use of deferment and forbearance is fairly widespread throughout the sector, documents produced indicate that a number of companies also pursue default management strategies that include loan counseling, education, and alternative repayment options. Default management contractors are paid to counsel students into.
> repayment options that ensure that students default outside the 2-year, soon to be 3-year, statutory window, in which the Department of Education monitors defaults.

> Apollo, like many other for-profit colleges, contracted with the General Revenue Corporation (GRC), a subsidiary of Sallie Mae, to "cure" students who are approaching default. The company also contracts with the i3 group for additional default management services. According to executives, i3's role is to "perform our 'swat' effort on the WIU F[iscal] Y[ear] 09 late stage delinquent student borrower population." In practice, documents indicate that

nearly all "cures" are accomplished by deferment or forbearance, not by students actually repaying their loans. Some companies pay different amounts for different types of cures, but it is unclear from the documents produced if this is Apollo's practice.

This practice is troubling for taxpayers. The cohort default rate is designed not just as a sanction but also as a key indicator of a school's ability to serve its students and help them secure jobs. If schools actively work to place students in forbearance and deferment, that means taxpayers and policymakers fail to get an accurate assessment of repayment and default rates. A school that has large numbers of its students defaulting on their loans indicates problems with program quality, retention, student services, career services, and reputation in the employer community. Aggressive default management undermines the validity of the default rate indicator by masking the true number of students who end up defaulting on their loans. Critically, schools that would otherwise face penalties—including loss of access to further taxpayer funds—continue to operate because they are able to manipulate their default statistics.

Moreover, forbearances may not always be in the best interest of the student. This is because during forbearance of Federal loans, as well as during deferment of unsubsidized loans, interest still accrues. The additional interest accrued during the period of forbearance is added to the principal loan balance at the end of the forbearance, with the result that interest then accrues on an even larger balance. Thus, some students will end up paying much more over the life of their loan after a forbearance or deferment.

18.     The Harkin Report criticized the deferment and forbearance programs as especially detrimental to the long term prospects of students, as these programs usually have negative long term financial consequences for the student-borrower, who will incur larger long term borrowing costs, while the Company can report lower student default rates and offer a rosier picture to investors and federal regulators. The report concluded:

Evidence suggests that some for-profit colleges use forbearance and deferment as tools to move the school's default rate, without concern

for a students' particular situation or whether it is in the best financial interest of the individual. Many students will end up paying more over the life of their loan after a forbearance or deferment.

19.   In addition to issues with the Company's lending practices, the Harkin Report also disclosed an undercover investigation conducted by the GAO, which revealed serious concerns regarding the academic quality of Apollo's programs. The GAO investigation found that the Company had very low academic standards, finding that there was very little interaction between students and teachers, and that plagiarism and other academic misconduct was not corrected by Apollo faculty.

20.   Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) defendants manipulated federal student loan and grant programs in order to appear to be in compliance with new federal regulations enacted in June 2011; (ii) defendants' predatory and deceptive recruiting and enrollment practices violated federal regulations enacted beginning in June 2011; and (iii)  the Company engaged in a number of practices, including loan forbearance programs, in order to create the appearance that the Company was in compliance with relevant government regulations.

21.   On April 1, 2014, the Company disclosed that the Department of Education was conducting an investigation into the company, and that the department had subpoenaed documents and communications related to student recruitment, attendance, completion, placement, defaults on loans, along with information on other corporate and financial matters.

9

22.     On this news, Apollo shares declined $3.10 per share, or over 8.8%, to close at $32.06 per share on April 2, 2014.

23.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9).

25.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

26.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Apollo's securities are traded within this District.

27.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

28.     Plaintiff, as set forth in the attached Certification, acquired Apollo securities at artificially inflated prices during the Class Period and has been damaged thereby.

29.     Defendant Apollo is an Arizona corporation with its principal executive offices located at 4025 S. Riverpoint Parkway, Phoenix, Arizona 85040.   Apollo's common stock

trades on the NASDAQ under the ticker symbol "APOL."

30.     Defendant Gregory W. Cappelli ("Cappelli") served at all relevant times as the Company's Chief Executive Officer ("CEO").

31.     Defendant Brian L. Swartz ("Swartz") served at all relevant times as the Company's Senior Vice-President and Chief Financial Officer.

32.     The defendants referenced above in ¶¶ 30-31 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

33.     Apollo is a publicly traded, for-profit education company headquartered in Phoenix, Arizona. Apollo employs approximately 15,000 non-faculty employees, and approximately 29,000 faculty members, and enrolls over 250,000 students across its online and in person course offerings. The Company, through its subsidiaries, grants associate, bachelor, masters and doctorate degrees to students in over 100 fields.

### Materially False and Misleading
### Statements Issued During the Class Period

34.     On October 19, 2011, the Company issued a press release announcing fiscal 2011 Fourth Quarter and Annual Results, and reported annual net revenue of $4.7 billion, or $4.04 per share, with total University of Phoenix Degree Enrollment at 380,800.

35.     The October 19, 2011 press release also stated:

> We set out at the beginning of 2011 to implement leading-edge student protections, differentiate University of Phoenix, and expand our business, said Apollo Group Co-Chief Executive Officer Chas Edelstein. We are pleased with our progress in each of these areas, including enhancing our student-centric approach to admissions,

11

launching University Orientation, investing in our learning platform, and advancing our plans to incorporate adaptive learning and connect education to careers.

Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli added, Through our focus on academic quality and innovation, we are aligning learning outcomes to student and employer needs and helping to bridge the workforce skills gap, one of the biggest issues facing our economy today. Our commitment is to support our students in achieving long-term success.

36.    On October 20, 2011 the Company filed an annual report for the period ended August 31, 2011 on a Form 10-K with the SEC signed by Defendants Capelli and Swartz, where it reiterated the Company's previously reported financial results and financial position. The annual report disclosed that in 2012, the Company derived 84% of its revenues from federal Title IV funds.

37.    In the Company's annual report, the Company also stated the following regarding its compliance efforts:

*Accreditation*

University of Phoenix is regionally accredited, which provides the following:

- recognition and acceptance by employers, other higher education institutions and governmental entities of the degrees and credits earned by students;

- qualification to participate in Title IV programs (in combination with state higher education operating and degree granting authority); and

- qualification for authority to operate in certain states.

Regional accreditation is accepted nationally as the basis for the recognition of earned credit and degrees for academic purposes, employment, professional licensure and, in some states, authorization to operate as a degree-granting institution. Under the terms of a reciprocity agreement among the six regional accrediting associations, including the Higher Learning Commission ("HLC") of the North Central Association of Colleges and Schools, which is the primary accrediting association of University of Phoenix, representatives of each region in which a regionally accredited institution operates may participate in the evaluations for reaffirmation of accreditation of that institution by its accrediting association.

In August 2010, University of Phoenix received a letter from HLC requiring University of Phoenix to provide certain information and evidence of compliance with HLC accreditation standards. The letter related to the August 2010 report published by the U.S. Government Accountability Office ("GAO") of its undercover investigation into the enrollment and recruiting practices of a number of proprietary institutions of higher education, including University of Phoenix. We submitted the response to HLC in September 2010 and subsequently responded to further requests for information. In July 2011, HLC informed University of Phoenix that the Special Committee formed to review this matter had completed its work, concluding that based on its limited review, it found no apparent evidence of systematic misrepresentations to students or that University of Phoenix's procedures in the areas of recruiting, financial aid and admissions are significantly inadequate or inappropriate. These were the areas on which HLC's review was focused. HLC also stated that there remain significant questions as well as areas that University of Phoenix should work on improving. HLC indicated that these will be reviewed by the comprehensive evaluation team at its previously scheduled visit beginning in March 2012, which is its next comprehensive evaluation visit. These questions relate to: student loans in collection and the minimization of student loan defaults; the offering of limited career services particularly in relation to associate programs; timing of prospective student access to financial aid advisors during the recruiting process; academic qualifications of admissions personnel and financial aid advisors; the hiring and evaluation of financial aid officers; retention of students, including the relationship of remediation to retention; and the role of the University of Phoenix First Year Sequence, or

curriculum, in relation to University of Phoenix's transfer policy and impacts on student retention.

\*\*\*

*U.S. Department of Education Rulemaking Initiative.*   In November 2009, the U.S. Department of Education convened two new negotiated rulemaking teams related to Title IV program integrity issues and foreign school issues. The resulting program integrity rules promulgated in October 2010 and June 2011 address numerous topics. The most significant for our business are the following:

- Modification of the standards relating to the payment of incentive compensation to employees involved in student recruitment and enrollment;

- Implementation of standards for state authorization of institutions of higher education;

- Adoption of a definition of "gainful employment" for purposes of the requirement for Title IV student financial aid that a program of study offered by a proprietary institution prepare students for gainful employment in a recognized occupation; and

- Expansion of the definition of misrepresentation, relating to the Department's authority under the Higher Education Act, as reauthorized, to suspend or terminate an institution's participation in Title IV programs if the institution engages in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of graduates, and expansion of the sanctions that the Department may impose for engaging in a substantial misrepresentation.

The Department published final program integrity regulations in October 2010, with most of the final rules effective July 1, 2011, including some reporting and disclosure rules related to gainful employment. On June 13, 2011, the Department published final regulations, effective July 1, 2012, on the metrics for determining whether an academic program prepares students for gainful employment, as discussed further below.

The program integrity rules require a large number of reporting and operational changes. *We believe we have substantially complied with*

14

*the new reporting and disclosure requirements that were effective July 1, 2011, and we expect to be in substantial compliance with the remaining requirements by the respective effective dates.* However, because of the significance of the changes and the scale and complexity of our educational programs, we may be unable to fully develop, test and implement all of the necessary modifications to our information management systems and administrative processes by the required dates. We may be subject to administrative or other sanctions if we are unable to comply with these reporting and disclosure requirements on a timely basis. In addition, these changes, individually or in combination, may impact our student enrollment, persistence and retention in ways that we cannot now predict.

[Emphasis added.]

\*\*\*

*Incentive Compensation.* A school participating in Title IV programs may not pay any commission, bonus or other incentive payments to any person involved in student recruitment or admissions or awarding of Title IV program funds, if such payments are based in any part directly or indirectly on success in enrolling students or obtaining student financial aid. The law and regulations governing this requirement do not establish clear criteria for compliance in all circumstances. Previously, there were twelve safe harbors that defined specific types of compensation that were deemed to constitute permissible incentive compensation. Prior to the effective date of the new program integrity regulations, we relied on several of these safe harbors to ensure that our compensation and recruitment practices complied with the applicable requirements.

In the final regulations adopted by the Department, the twelve safe harbors were eliminated and, in lieu of the safe harbors, some of the relevant concepts relating to the incentive compensation limitations are defined. These changes increase the uncertainty about what constitutes incentive compensation and which employees are covered by the regulation. This makes the development of effective and compliant performance metrics more difficult to establish. In response to the Department's concern about the impact of compensation structures that relied on the safe harbors and in order to enhance the admissions process for our students, we developed a new structure, which we believe complies with the Department's new rule, and implemented it on a broad scale during the first quarter of fiscal year 2011. In connection with this, we eliminated

enrollment results as a component of compensation for our admissions personnel effective September 1, 2010.

This change in our approach to recruiting, which among other things reduces the emphasis on enrollment and increases the emphasis on improving the student experience, has adversely impacted our enrollment rates and increased our operating costs. We believe this change is consistent with our on-going efforts to lead the industry in addressing the concerns of the Department and others, including members of Congress, about admissions practices in the proprietary sector. We anticipate that this increased cost and the impact on our revenue from reduced enrollment will be offset partly by the benefits realized from improved student retention. However, we are not able to precisely predict the impact.

The elimination of the twelve safe harbors also affected the manner in which we conduct our IPD business. Our IPD business previously utilized a revenue sharing model with its client institutions, which was expressly permitted under one of the twelve incentive compensation safe harbors. We have modified this economic model to comply with the rules effective July 1, 2011, which among other things, has required changes to existing customer contracts and caused certain customers to choose to discontinue their arrangement with IPD, which has adversely impacted IPD's financial results. We believe our modifications to IPD's economic model comply with the Department's new rule. IPD's net revenue and operating income represented less than 2% of our consolidated net revenue and operating income in fiscal year 2011.

38.     On January 5, 2012, the Company issued a press release announcing results for the three months ended November 30, 2011. Apollo reported net revenue of $1.17 billion and diluted earnings per share of $1.28 per share, with degreed enrollment at 373,100.

39.     In that press release the Company stated:

Our strategic initiatives to further enhance the student experience and provide world-class student protections remain our focus, said Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli. We are also pleased to report positive new enrollment growth during the first quarter and improving trends in admissions advisor effectiveness, while reaching students who we

believe can be successful in our degree programs.

Apollo Group Co-Chief Executive Officer Chas Edelstein added, "During the first quarter, we continued to invest in areas that will further differentiate University of Phoenix and enhance the student experience. We believe the acquisition of Carnegie Learning will accelerate our efforts to incorporate adaptive learning technologies into our academic platform, which support our students' success in the classroom.

40.     On January 5, 2012, the Company filed a quarterly report for the period ended November 30, 2011 on a Form 10-Q with the SEC, signed by Defendants Capelli and Swartz, which reiterated the Company's previously reported financial results and financial position.

41.     The quarterly report also stated the following regarding the Company's financial aid program and compliance with applicable regulations:

On May 25, 2011, we were notified that a qui tam complaint had been filed against us in the U.S. District Court, Eastern District of California, by private relators under the Federal False Claims Act and California False Claims Act, entitled USA and State of California ex rel. Hoggett and Good v. University of Phoenix, et al, Case Number 2:10-CV-02478-MCE-KJN. When the federal government declines to intervene in a qui tam action, as it has done in this case, the relators may elect to pursue the litigation on behalf of the federal government and, if successful, they are entitled to receive a portion of the federal government's recovery.
The complaint alleges, among other things, that University of Phoenix has violated the Federal False Claims Act since December 12, 2009 and the California False Claims Act for the preceding ten years by falsely certifying to the U.S. Department of Education and the State of California that University of Phoenix was in compliance with various regulations that require compliance with federal rules regarding the payment of incentive compensation to admissions personnel, in connection with University of Phoenix's participation in student financial aid programs. In addition to injunctive relief and fines, the relators seek significant damages on behalf of the Department of Education and the State of California, including all student financial aid disbursed by the Department to our students since December 2009 and by the State of California to our students

during the preceding ten years. On July 12, 2011, we filed a motion to dismiss and on August 30, 2011, relators filed a motion to file a Second Amended Complaint. On October 11, 2011 , the Court granted Plaintiffs' motion to file a Second Amended Complaint and declined to consider the merits of our motion to dismiss at that time. On November 2, 2011, we filed a motion to dismiss the relators Second Amended Complaint, which is currently pending before the Court.

Because of the many questions of fact and law that may arise, the outcome of this legal proceeding is uncertain at this point. Based on the information available to us at present, we cannot reasonably estimate a range of loss for this action and, accordingly, we have not accrued any liability associated with this action.

\*\*\*

*Higher Learning Commission*. In August 2010, University of Phoenix received a letter from its principal accreditor, the Higher Learning Commission ("HLC"), requiring University of Phoenix to provide certain information and evidence of compliance with HLC accreditation standards. The letter related to the August 2010 report published by the Government Accountability Office of its undercover investigation into the enrollment and recruiting practices of a number of proprietary institutions of higher education, including University of Phoenix. In July 2011, HLC informed University of Phoenix that the Special Committee formed to review this matter had completed its work, concluding that based on its limited review, it found no apparent evidence of systematic misrepresentations to students or that University of Phoenix's procedures in the areas of recruiting, financial aid and admissions are significantly inadequate or inappropriate. These were the areas on which HLC's review was focused. HLC also stated that there remain significant questions and areas that University of Phoenix should work on improving. HLC indicated that these areas of concern will be reviewed at its next previously scheduled comprehensive evaluation visit in March 2012.

42.     On March 26, 2012, the Company issued a press release announcing results for the three months ended February 29, 2012. Apollo reported net revenue of $969.6 billion, and diluted earnings per share of $0.51 per share, with degreed enrollment at 355,800.

18

43.     In that press release the Company stated:

> Empowering our students to achieve their desired academic and life outcomes is our highest priority, said Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli. We are building on our mission to provide world class education, as well as connecting education to careers, in order to further differentiate University of Phoenix. We are committed to leading education into the future.

> Apollo Group Co-Chief Executive Officer Chas Edelstein added, We are working to continually improve our services to students to enhance their educational experience and outcomes. As we pursue opportunities for increased operating efficiency, our efforts to optimize allow us to invest in innovation and create new and better ways to reach adult learners, while keeping education affordable and accessible and delivering the best possible experience to our students

44.     On March 26, 2012, the Company filed a quarterly report for the period ended February 29, 2012 on a Form 10-Q with the SEC signed by Defendants Capelli and Swartz, where it reiterated the Company's previously reported financial results and financial position.

45.     On June 25, 2012, the Company issued a press release announcing results for the three months ended May 31, 2012. Apollo reported net revenue of $1.13 billion and diluted earnings per share of $1.13 per share, with degreed enrollment at 346,300.

46.     In that press release the Company stated:

> We are focused on delivering the best possible experience and service to support working adults, to address workforce needs, and to strengthen the connection to careers for our students, said Apollo Group Co-Chief Executive Officer Chas Edelstein. Evaluating key touch points, we are creating programs and support services that allow our students to focus on learning, experiencing achievements along the way to help inspire them and enhance their long-term outcomes.

> Apollo Group Co-Chief Executive Officer and Apollo Global Chairman Greg Cappelli added, We are committed to being part of

19

the solution to empower our country by providing access to affordable education and helping students develop the skills they need to succeed. We are investing in innovation to create new and better ways, enhanced by technology, to support adult learners and to connect our students' academic path to their career aspirations.

47.  On June 25, 2012, the Company filed a quarterly report for the period ended May 31, 2012 on a Form 10-Q with the SEC signed by Defendants Capelli and Swartz, which reiterated the Company's previously reported financial results and financial position.

48.  The quarterly report also stated the following regarding the Company's financial aid program and compliance with applicable regulations:

> *California Grant Program ("Cal Grants")*. In California, the state in which we conduct the most business by revenue, University of Phoenix students are eligible for Cal Grants, the principal state-funded grant program. The Governor and the state legislature have proposed several changes to the Cal Grant program for the student aid year beginning July 1, 2012 which, if adopted, could reduce the award amount or eliminate the eligibility of some or all of our new and continuing students with regard to these grants. Our students received approximately $20 million of grants under the Cal Grant Program in fiscal year 2011 and we estimate they would receive approximately $21 million in fiscal year 2012. These changes could result in increased student borrowing, decreased enrollment and adverse impacts on our 90/10 Rule percentage, as discussed below.

> *Higher Learning Commission*. In August 2010, University of Phoenix received a letter from its principal accreditor, the Higher Learning Commission ("HLC"), requiring University of Phoenix to provide certain information and evidence of compliance with HLC accreditation standards. The letter related to the August 2010 report published by the Government Accountability Office of its undercover investigation into the enrollment and recruiting practices of a number of proprietary institutions of higher education, including University of Phoenix. In July 2011, HLC informed University of Phoenix that the Special Committee formed to review this matter had completed its work, concluding that based on its limited review, it found no apparent evidence of systematic misrepresentations to students or that University of Phoenix's procedures in the areas of

recruiting, financial aid and admissions are significantly inadequate or inappropriate. HLC also stated that there remain significant questions and areas that University of Phoenix should work on improving. HLC is reviewing these areas of concern as part of its previously scheduled comprehensive evaluation visit, which began in March 2012.

*Rulemaking Initiatives*.  In October 2010 and June 2011, the U.S. Department of Education promulgated new rules related to Title IV program integrity issues and foreign school issues. The most significant of these rules for our business are the following:

- Modification of the standards relating to the payment of incentive compensation to employees involved in student recruitment and enrollment;

- Implementation of standards for state authorization of institutions of higher education;

- Adoption of a definition of "gainful employment" for purposes of the requirement of Title IV student financial aid that a program of study offered by a proprietary institution prepare students for gainful employment in a recognized occupation; and

- Expansion of the definition of misrepresentation, relating to the Department's authority to suspend or terminate an institution's participation in Title IV programs if the institution engages in substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates, and expansion of the sanctions that the Department may impose for engaging in a substantial misrepresentation.

49.     On October 16, 2012, the Company issued a press release announcing fiscal 2012 Fourth Quarter and Annual Results, and reported annual net revenue of $4.3 billion, or $3.22 per share, with total University of Phoenix Degreed Enrollment at 328,400.

50.     In the October 16, 2012 press release, the Company also stated:

This past year, we have made great strides in executing on our strategy to differentiate University of Phoenix, diversify Apollo

Group, and refine our business processes and delivery structure to be more efficient and effective, while providing a world-class student experience, said Apollo Group Chief Executive Officer and Apollo Global Chairman Greg Cappelli. As we build the university of the future, our priority is to connect education to careers for our students, helping them achieve their desired academic and life outcomes.

51.     On October 22, 2012 the Company filed an annual report for the period ended August 31, 2012 on a Form 10-K with the SEC signed by Defendants Capelli and Swartz, where it reiterated the Company's previously reported financial results and financial position. The annual report disclosed that in 2012, the Company derived 84% of its revenues from federal Title IV funds.

52.     The Company informed investors that the SEC was investigating Company insiders for potentially violating securities law by engaging in illegal insider trading, Apollo stated in relevant part:

During April 2012, we received notification from the Enforcement Division of the Securities and Exchange Commission requesting documents and information relating to certain stock sales by company insiders and our February 28, 2012 announcement filed with the Commission on Form 8-K regarding revised enrollment forecasts.

53.     In the Company's annual report, the Company also stated the following regarding its compliance efforts:

In August 2010, HLC required University of Phoenix to provide certain information and evidence of compliance with HLC accreditation standards. This followed the August 2010 report published by the U.S. Government Accountability Office of its undercover investigation into the enrollment and recruiting practices of a number of proprietary institutions of higher education, including University of Phoenix. In July 2011, the Special Committee formed

to review this matter completed its work, concluding that based on its limited review, it found no apparent evidence of systematic misrepresentations to students or that University of Phoenix's procedures in the areas of recruiting, financial aid and admissions were significantly inadequate or inappropriate. HLC also stated that there remained significant questions and areas that University of Phoenix should work on improving. HLC is reviewing these areas of concern as part of its previously scheduled comprehensive reaffirmation evaluation visit, which began in March 2012.

In September 2012, HLC required University of Phoenix to provide a response to data submitted on University of Phoenix's 2012 Institutional Annual Report. HLC reviews data from all of its accredited and candidate for accreditation member institutions. HLC identified three non-financial indicators for which it sought additional information:

Increase or decrease in full-time faculty of 25% or more from the prior year's report. Ratio of undergraduate full-time equivalent students to undergraduate faculty of greater than 35 in the period reported; and three-year student loan default rate of 25% or more.

University of Phoenix expects to respond to HLC in late October 2012. HLC has indicated that it will assign several members of the current team reviewing University of Phoenix's reaffirmation to evaluate University of Phoenix's response to the report, and that their evaluation will become an appendix to the review team's report on University of Phoenix's reaffirmation.

***

*90/10 Rule.* University of Phoenix and Western International University, and all other proprietary institutions of higher education, are subject to the so-called "90/10 Rule" under the Higher Education Act, as reauthorized. Under this rule, a proprietary institution will be ineligible to participate in Title IV programs if for any two consecutive fiscal years it derives more than 90% of its cash basis revenue, as defined in the rule, from Title IV programs. An institution that derives more than 90% of its cash basis revenue from Title IV programs for any single fiscal year will be automatically placed on provisional certification for two fiscal years and will be subject to possible additional sanctions determined to be appropriate under the circumstances by the U.S. Department of Education. While the Department has broad discretion to impose additional sanctions on such an institution, there is only limited precedent

23

available to predict what those sanctions might be, particularly in the current regulatory environment.

***

Cohort Default Rates.  To remain eligible to participate in Title IV programs, educational institutions must maintain student loan cohort default rates below specified levels. Each cohort is the group of students who first enter into student loan repayment during a federal fiscal year (ending September 30). The currently applicable cohort default rate for each cohort is the percentage of the students in the cohort who default on their student loans prior to the end of the following federal fiscal year, which represents a two-year measuring period. The cohort default rates are published by the U.S. Department of Education approximately 12 months after the end of the measuring period. Thus, in September 2012 the Department published the two-year cohort default rates for the 2010 cohort, which measured the percentage of students who first entered into repayment during the year ended September 30, 2010 and defaulted prior to September 30, 2011. As discussed below, the measurement period for the cohort default rate has been increased to three years starting with the 2009 cohort and both three-year and two-year cohort default rates will be published each September until the 2011 three-year cohort default rate is published in September 2014.

If an educational institution's two-year cohort default rate exceeds 10% for any one of the three preceding years, it must delay for 30 days the release of the first disbursement of U.S. federal student loan proceeds to first time borrowers enrolled in the first year of an undergraduate program. University of Phoenix and Western International University implemented a 30-day delay for such disbursements a few years ago. If an institution's two-year cohort default rate equals or exceeds 25% for three consecutive years or 40% for any given year, it will be ineligible to participate in Title IV programs.

The two-year cohort default rates for University of Phoenix, Western International University and for all proprietary postsecondary institutions for the federal fiscal years 2010, 2009 and 2008 were as follows:

Two-Year Cohort Default Rates for Cohort Years Ended September 30,

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| University of Phoenix (1) | 17.9% | 18.8% | 12.9% |

24

Western International University (1)      7.7%          9.3%
10.7%

\*\*\*

While we expect that the challenging economic environment will continue to put pressure on our student borrowers, we believe that our ongoing efforts to shift our student mix to a higher proportion of bachelor's and graduate level students, the full implementation of our University Orientation program in November 2010 and our investment in student protection initiatives and repayment management services will continue to stabilize and over time favorably impact our rates. As part of our repayment management initiatives, effective with the 2009 cohort, we engaged third party service providers to assist our students who are at risk of default. These service providers contact students and offer assistance, which includes providing students with specific loan repayment information such as repayment options and loan servicer contact information, and they attempt to transfer these students to the relevant loan servicer to resolve their delinquency. In addition, we are intensely focused on student retention and enrolling students who have a reasonable chance to succeed in our programs, in part because the rate of default is higher among students who do not complete their degree program compared to students who graduate. Based on the available preliminary data, we do not expect the University of Phoenix or Western International University 2011 two-year cohort default rates to equal or exceed 25%.

54.    Apollo's annual report also touted the Company's strong Academic standards:

*Academic Quality.* University of Phoenix has an academic quality assessment plan that measures whether the institution provides consistent quality and academic rigor through its delivery of educational programs online and on geographically dispersed campuses. A major component of this plan is the assessment of student learning. To assess student learning, University of Phoenix measures whether graduates meet its programmatic and learning goals. The measurement is composed of the following four ongoing and iterative steps:

Prepare an annual assessment result report for academic programs, based on student learning outcomes;

Implementing improvements based on assessment results; and

Monitoring effectiveness of implemented improvements.

55.    On January 8, 2013, the Company issued a press release announcing results for the three months ended November 30, 2012. Apollo reported net revenue of $1.1 billion and diluted earnings per share of $1.18 per share, with degreed enrollment at 319,700.

56.    In that press release, the Company stated:

> In the first quarter, we continued to execute on our strategy to differentiate University of Phoenix, diversify Apollo Group and to further optimize our operations, said Apollo Group Chief Executive Officer Greg Cappelli. We are rolling out new career-oriented tools for students, as well as working with leading companies to help them meet their needs to develop an educated workforce. We are committed to become the educator of choice to connect education to careers and believe this approach will position us for long-term success.

57.    On January 8, 2013, the Company filed a quarterly report for the period ended November 30, 2012 on a Form 10-Q with the SEC signed by Defendants Capelli and Swartz, where it reiterated the Company's previously reported financial results and financial position.

58.    The quarterly report also stated the following regarding the Company's financial aid program and compliance with applicable regulations:

> In fiscal year 2012, University of Phoenix generated 91% of our total consolidated net revenue and more than 100% of our operating income, and 84% of University of Phoenix's cash basis revenue for eligible tuition and fees was derived from Title IV financial aid program funds, as calculated under the 90/10 Rule.

> All U.S. federal financial aid programs are established by Title IV of the Higher Education Act and regulations promulgated thereunder. The U.S. Congress must periodically reauthorize the Higher Education Act and annually determine the funding level for each Title IV program. In August 2008, the Higher Education Act was reauthorized through September 30, 2013 by the Higher Education

26

Opportunity Act. Changes to the Higher Education Act are likely to occur in subsequent reauthorizations, and the scope and substance of any such changes cannot be predicted.

The Higher Education Act, as reauthorized, specifies the manner in which the U.S. Department of Education reviews institutions for eligibility and certification to participate in Title IV programs. Every educational institution involved in Title IV programs must be certified to participate and is required to periodically renew this certification.

University of Phoenix was recertified in November 2009 and entered into a new Title IV Program Participation Agreement which expired December 31, 2012. University of Phoenix has submitted necessary documentation for re-certification. University of Phoenix's eligibility continues on a month-to-month basis until the Department issues its decision on the application. We have no reason to believe that our application will not be renewed in due course, and it is not unusual to be continued on a month-to-month basis until the Department completes its review.

59.     On March 25, 2013, the Company issued a press release announcing results for the three and six months ended February 28, 2013, Apollo reported second quarter revenue of $834.4 million and diluted earnings per share of $0.12 per share, or $0.34 per share excluding special items.

60.     In the press release, the Company stated:

"Higher education is rapidly evolving as workforce demands and technological innovations drive change in our global economy," said Apollo Group Chief Executive Officer Greg Cappelli. "We are further positioning our organization and brand with our continued commitment to help students acquire real workplace skills, achieve their academic goals, and – through the power of education – realize their career aspirations."

27

61.     On March 25, 2013, the Company filed a quarterly report for the period ended February 28, 2013 on a Form 10-Q with the SEC signed by Defendants Capelli and Swartz, which reiterated the Company's previously reported financial results and financial position.

62.     On June 25, 2013, the Company issued a press release announcing results for the three and nine months ended May 31, 2013, with third quarter revenue of $946.8 million and diluted earnings per share of $0.71 per share, or $1.05 per share excluding special items.

63.     In the press release, the Company stated:

> This is a time of extraordinary change in higher education. At Apollo Group we are creating a more nimble organization and reengineering our learning solutions to better support our student's needs and meet the demands of employers. We are focused on making the necessary changes to deliver an improved set of educational offerings, said Apollo Group Chief Executive Officer Greg Cappelli. As education evolves, the transfer of knowledge and the acquisition of skills for working adults will be delivered in new and different ways. We are working directly with employers to define the skills students must bring to the workplace to more effectively compete in a global economy. The repositioning of higher education—also reflected in Apollo Group's mission to create a more educated global workforce—has perhaps never been more important.

64.     On June 25, 2013, the Company filed a quarterly report for the period ended May 31, 2013 on a Form 10-Q with the SEC, signed by Defendants Capelli and Swartz, which reiterated the Company's previously reported financial results and financial position.

65.     On October 22, 2013, the Company issued a press release announcing financial results for the three months and fiscal year ended August 31, 2013, with fourth quarter revenue of $845.0 million and diluted earnings per share of $0.19 per share, or $0.55 per share excluding special items.

66.     The press release also stated that:

Fiscal Year 2013 brought challenges and opportunities for Apollo Group, said Apollo Group Chief Executive Officer Greg Cappelli. We set out this year to differentiate University of Phoenix, diversify Apollo Group and build a more efficient organization. We have made meaningful progress in each of these areas. With hundreds of millions of worldwide learners in need of higher education in this decade alone, we are well positioned for 2014 and beyond to help create a more educated global workforce and strengthen our great partnerships across four continents.

67.     On October 22, 2013, the Company filed an annual report for the period ended August 31, 2013 on a Form 10-K with the SEC signed by Defendants Cappelli and Swartz, which reiterated the Company's previously reported financial results and financial position.

68.     In its 10-K, the Company stated the following regarding its compliance efforts:

To be eligible to participate in Title IV programs, a postsecondary institution must be accredited by an accrediting body recognized by the U.S. Department of Education, must comply with the Higher Education Act, as reauthorized, and all applicable regulations thereunder, and must be authorized to operate by the appropriate regulatory authority in each state where the institution maintains a physical presence. We have summarized below recent material activity in the regulatory environment affecting our business and the most significant regulatory requirements applicable to our domestic postsecondary operations.

Changes in or new interpretations of applicable laws, rules, or regulations could have a material adverse effect on our eligibility to participate in Title IV programs, accreditation, authorization to operate in various states, permissible activities, and operating costs. The failure to maintain or renew any required regulatory approvals, accreditation, or state authorizations could have a material adverse effect on us. Refer to Part I, Item 1A, Risk Factors - Risks Related to the Highly Regulated Industry in Which We Operate.

Eligibility and Certification Procedures.  The Higher Education Act, as reauthorized, specifies the manner in which the U.S. Department of Education reviews institutions for eligibility and certification to

participate in Title IV programs. Every educational institution involved in Title IV programs must be certified to participate and is required to periodically renew this certification. University of Phoenix was recertified in November 2009 and entered into a new Title IV Program Participation Agreement which expired on December 31, 2012. University of Phoenix has submitted necessary documentation for re-certification and its eligibility continues on a month-to-month basis until the Department issues its decision on the application. We have no reason to believe that the University's application will not be renewed in due course, and it is not unusual to be continued on a month-to-month basis until the Department completes its review. However, we cannot predict whether, or to what extent, the imposition of the Notice sanction by The Higher Learning Commission might have on this process.

Western International University was recertified in May 2010 and entered into a new Title IV Program Participation Agreement which expires on September 30, 2014.

U.S. Department of Education Rulemaking Initiative. Negotiated rulemaking public hearings were held by the U.S. Department of Education in May and June 2013. Topics included cash management of Title IV program funds, state authorization for programs offered through distance education or correspondence education, and gainful employment, among others. The negotiated rulemaking process is expected to produce new regulations which will be published this fall and may be effective as soon as July 1, 2014. More information can be found at
http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/index.html.

A negotiated rulemaking committee was convened by the Department in September 2013 specifically on the topic of gainful employment. Prior to the September 2013 committee meeting, the Department released draft regulations on gainful employment. The draft regulations provide for two metrics: an annual debt-to-earnings ratio, and a debt service-to-discretionary income ratio. As proposed, a program would become ineligible for Title IV funding if it fails both metrics in two out of any three consecutive years, or is in a specified "warning zone" for either metric in any four consecutive years. The timing and substance of final regulations dealing with gainful employment cannot be predicted at this time. More information can be found at

http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/gainfu
lemployment.html.

Refer to Part I, Item 1A, Risk Factors - Risks Related to the Highly
Regulated Industry in Which We Operate - Rulemaking by the U.S.
Department of Education could materially and adversely affect our
business.

90/10 Rule. University of Phoenix and Western International
University, and all other proprietary institutions of higher education,
are subject to the so-called "90/10 Rule" under the Higher Education
Act, as reauthorized. Under this rule, a proprietary institution will be
ineligible to participate in Title IV programs for at least two fiscal
years if for any two consecutive fiscal years it derives more than
90% of its cash basis revenue, as defined in the rule, from Title IV
programs. If an institution is determined to be ineligible, any
disbursements of Title IV program funds made while ineligible must
be repaid to the Department. An institution that derives more than
90% of its cash basis revenue from Title IV programs for any single
fiscal year will be automatically placed on provisional certification
for two fiscal years and will be subject to possible additional
sanctions determined to be appropriate under the circumstances by
the U.S. Department of Education.

***

We believe that our efforts to shift our student mix to a higher
proportion of bachelor's and graduate level students and our
investment in student protection initiatives and repayment
management services will continue to stabilize and over time
favorably impact our rates. As part of our repayment management
initiatives, effective with the 2009 cohort, we engaged third-party
service providers to assist our students who are at risk of default.
These service providers contact students and offer assistance, which
includes providing students with specific loan repayment
information such as repayment options and loan servicer contact
information, and they attempt to transfer these students to the
relevant loan servicer to resolve their delinquency. In addition, we
are intensely focused on student retention and enrolling students who
have a reasonable chance to succeed in our programs, in part
because the rate of default is higher among students who do not
complete their degree program compared to students who graduate.

31

Based on our most recent trends, we expect that our 2011 three-year cohort default rates will be lower than our 2010 three-year cohort default rates. However, if our student loan default rates approach the applicable limits, we may be required to increase efforts and resources dedicated to improving these default rates. This is challenging because most borrowers who are in default or at risk of default are no longer students, and we may have only limited contact with them. Furthermore, recently there has been increased attention by members of Congress and others on default aversion activities of proprietary education institutions. If such attention leads to congressional or regulatory action restricting the types of default aversion assistance that educational institutions are permitted to provide, the default rates of our former students may be negatively impacted. Accordingly, there is no assurance that we would be able to effectively improve our default rates or improve them in a timely manner to meet the requirements for continued participation in Title IV funding if we experience a substantial increase in our student loan default rates.

\* \* \*

Office of the Inspector General of the U.S. Department of Education ("OIG") . In October 2011, the OIG notified us that it was conducting a nationwide audit of the Department's program requirements, guidance, and monitoring of institutions of higher education offering distance education. In connection with the OIG's audit of the Department, the OIG examined a sample of University of Phoenix students who enrolled during the period from July 1, 2010 to June 30, 2011. The OIG subsequently notified the University that in the course of this review it identified certain conditions that the OIG believes are Title IV compliance exceptions at University of Phoenix. Although the University is not the direct subject of the OIG's audit of the Department, the OIG has asked the University to respond so that it may consider the University's views in formulating its audit report of the Department. In September 2013, the OIG provided to University of Phoenix, among other institutions, a draft appendix to its audit report. The draft appendix again identifies compliance exceptions at University of Phoenix. University of Phoenix has responded to the appendix. These exceptions relate principally to the calculation of the amount of Title IV funds returned after student withdrawals and the process for confirming student eligibility prior to disbursement of Title IV funds.

69.     On January 7, 2014, the Company issued a press release announcing results for the three months ended November 30, 2013, with revenue of $856.3 million and diluted earnings per share of $0.87 per share, or $1.04 per share excluding special items.

70.     On January 7, 2014, the Company filed a quarterly report for the period ended November 30, 2013 on a Form 10-Q with the SEC signed by Defendants Capelli and Swartz, which  reiterated the Company's previously reported financial results and financial position.

71.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including:    (i) defendants manipulated federal student loan and grant programs in order to appear to be in compliance with new federal regulations enacted beginning in June 2011; (ii) defendants' predatory and deceptive recruiting and enrollment practices violated federal regulations enacted beginning in June 2011; and (iii) the Company engaged in a number of practices, including loan forbearance programs, in order to create the appearance that the Company was in compliance with relevant government regulations.

## THE TRUTH EMERGES

72.     On April 1, 2014, the Company disclosed that the Department of Education was conducting an investigation into the company, and that the department had subpoenaed documents and communications related to student recruitment, attendance, completion, placement, defaults on loans, along with information on other corporate and financial matters.

33

73.     On this news, Apollo shares declined $3.10 per share, or over 8.8%, to close at $32.06 per share on April 2, 2014.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Apollo securities during the Class Period (the "Class"); and were damaged upon the revelation of the corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

75.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Apollo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Apollo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

78.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Apollo;

- whether the Individual Defendants caused Apollo to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Apollo securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

79.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

35

80.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Apollo securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Apollo securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

81.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

82.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
Section 10(b) and Rule 10b-5 Promulgated Thereunder)

83.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

84.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Apollo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Apollo securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

86.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Apollo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and

misrepresented the truth about Apollo's finances and business prospects.

87. By virtue of their positions at Apollo, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

88. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Apollo, the Individual Defendants had knowledge of the details of Apollo's internal affairs.

89. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Apollo. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Apollo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Apollo securities was artificially inflated throughout the Class

Period.  In ignorance of the adverse facts concerning Apollo's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Apollo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

90.    During the Class Period, Apollo securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Apollo securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Apollo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Apollo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

91.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

92.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

93.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.     During the Class Period, the Individual Defendants participated in the operation and management of Apollo, and conducted and participated, directly and indirectly, in the conduct of Apollo's business affairs.  Because of their senior positions, they knew the adverse non-public information about Apollo's misstatement of income and expenses and false financial statements.

95.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Apollo's financial condition and results of operations, and to correct promptly any public statements issued by Apollo which had become materially false or misleading.

96.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Apollo disseminated in the marketplace during the Class Period concerning Apollo's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Apollo to engage in the wrongful acts

complained of herein. The Individual Defendants therefore, were "controlling persons" of Apollo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Apollo securities.

97.     Each of the Individual Defendants, therefore, acted as a controlling person of Apollo.  By reason of their senior management positions and/or being directors of Apollo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Apollo to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Apollo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

98.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Apollo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated this 24th day of April, 2014

**MARTIN & BONNETT, P.L.L.C.**

By:   s/Susan Martin
Susan Martin
Jennifer Kroll
1850 N. Central Ave. Suite 2010
Phoenix, AZ 85004
(602) 240-6900
Facsimile: (602) 240-2345
smartin@martinbonnett.com
jkroll@martinbonnett.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**
Jeremy A. Lieberman (*pro hac vice* app. to be filed)
Lesley F. Portnoy (*pro hac vice* app. to be filed)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom (*pro hac vice* app. to be filed)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181

Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1.  I, _NADER  SALEH_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Apollo Education Group, Inc. ("Apollo Education" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Apollo Education securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Apollo Education securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Apollo Education securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed _____ 23 APRIL 2014
            **(Date)**

_____
         **(Signature)**

_____ NADER SALETI _____
      **(Type or Print Name)**

**SUMMARY OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 1 APR 2014 | Bought 35 APR 19 2014 39 CALL @ | | 0.61 |
| 1 APR 2014 | Bought 80APR 19 2014 39 CALL @ | | 0.61 |
| 1 APR 2014 | Bought 55 APR 19 2014 39 CALL @ | | 0.62 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |